UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
KHALED KADRY,

                         Plaintiff,                              **COMPLAINT**

     -against-

COLUMBIA UNIVERSITY MEDICAL CENTER, and
JORDAN SCOTT ORANGE, and JON EVANS, as        **JURY TRIAL DEMANDED**
individuals,

                        Defendants.
-------------------------------------------------------------------X

       Plaintiff KHALED KADRY, by and through his attorneys, Helen F. Dalton & Associates,

P.C., alleges, upon personal knowledge as to himself and upon information and belief as to other

matters as follows:

## PRELIMINARY STATEMENT

       1.  Plaintiff, KHALED KADRY, through undersigned counsel, brings this action against

COLUMBIA UNIVERSITY MEDICAL CENTER, and JORDAN SCOTT ORANGE, and JON

EVANS, as individuals, (collectively, "Defendants"), to recover damages for egregious violations

of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42

U.S.C. § 2000e, *et seq.* ("Title VII"), the New York State Human Rights Law, New York

Executive Law §§ 296-297 ("NYSHRL"), and the New York City Human Rights Law, N.Y. City

Admin. Code §§ 8-101, *et seq.* ("NYCHRL") to obtain monetary damages and appropriate

equitable, injunctive, and declaratory relief for Defendants' unlawful acts of discrimination in

violation of the above-referenced statutes and other appropriate rules, regulations, statutes and

ordinances for unlawful discrimination on the basis of national origin, race and religion, and

unlawful retaliation arising out of Plaintiff's employment with Defendants at COLUMBIA

UNIVERSITY MEDICAL CENTER located at 622 West 168th Street, New York, NY 10032.

       2.  As explained herein, during the course of Plaintiff's employment, the Plaintiff was

subjected to harassment, hostile working environment, retaliation and egregious acts of unlawful

discrimination on the basis of Plaintiff's national origin, and/or race perpetrated by JORDAN SCOTT ORANGE and JON EVANS, culminating in the wrongful termination of Plaintiff's employment at COLUMBIA UNIVERSITY MEDICAL CENTER.

3. Defendants' conduct was knowing, malicious, willful and wanton and showed a reckless disregard for the Plaintiff, which has caused and continues to cause Plaintiff to suffer substantial economic and non-economic damages, permanent harm to his professional and personal reputations and severe mental anguish and emotional distress.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 in that it arises under Plaintiff's federal claims pursuant to 42 U.S.C. § 2000e, *et seq.*

5. This Court has supplemental jurisdiction over Plaintiff's state and local law claims pursuant to 28 U.S.C. §1367 as these claims arise from a common nucleus of operative fact.

6. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

7. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§2201 & 2202.

8. Plaintiff timely filed his complaint with the United States Equal Employment Opportunity Commission ("EEOC") in or around October 2019 (EEOC Charge No.: 524-2019-01760) charging the Defendants with unlawful discriminatory practices based on their actions and requesting a Right to Sue Letter from EEOC.

9. On October 29, 2020, the EEOC issued the Plaintiff notice of right to bring suit in federal district court based on the allegations of unlawful discrimination on the basis of national origin.

10. This action has been filed within 90 days of Plaintiff's receipt of their right-to-sue letter from the EEOC. Any and all other prerequisites to the filing of this suit have been met.

## THE PARTIES

11. Plaintiff, KHALED KADRY is a resident of the State of New York and was employed by Defendants as the Director of Revenue Cycle at the Columbia University Medical Center Department of Pediatrics from May 9, 2016, until his employment was wrongfully terminated on June 20, 2019.

12. Defendant COLUMBIA UNIVERSITY MEDICAL CENTER (hereinafter, "Columbia" or "Columbia University"), is a clinical research enterprise which operates various professional colleges, schools, and medical facilities, with a principal office located at 622 West 168th Street, New York, New York 10032.

13. Upon information and belief, Defendant Columbia University is organized, and existing by virtue of the laws of the State of New York, and is a corporation authorized to conduct business under the laws of the State of New York.

14. At all times relevant hereto, Defendant JORDAN SCOTT ORANGE (hereinafter "Orange" or "Defendant Orange"), was and is the Chairman of the Department of Pediatrics at Defendant Columbia, and a supervisor to both Plaintiff and Defendant Evans.

15. At all times relevant hereto, Defendant JON EVANS (hereinafter "Evans" or "Defendant Evans"), was and is the Vice Chair of the Department of Pediatrics at Defendant Columbia, and a direct supervisor of Plaintiff.

16. At all times relevant hereto, Defendant Orange was and is an agent of Defendant Columbia University.

17. At all times relevant hereto, Defendant Evans was and is an agent of Defendant Columbia University.

18. At all times relevant hereto, Defendants were Plaintiff's employer within the meaning of the Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), the New York State Human Rights Law, New York Executive Law §§ 296-297 ("NYSHRL"), the New York City Human Rights Law, and N.Y. City Admin. Code §§ 8-101, *et seq*. ("NYCHRL").

**STATEMENT OF FACT**

19. On May 9, 2016, Columbia University hired Plaintiff Kadry to serve as Columbia's Director of Revenue Cycle in the Department of Pediatrics, at Defendants' offices located at 622 West 168th Street, New York, New York 10032.

20. In Plaintiff's capacity as Director of Revenue Cycle, Plaintiff's duties included, among other things, overseeing financial operations of Columbia's Department of Pediatrics from financial year 2016 onward, implementing new process improvement projects that increased revenue by approximately 14% from previous years, restructuring the Revenue Cycle Department to operate more efficiently, creating labor productivity metrics for staff to ensure efficiency and productivity, implementing new action plans to reduce denials, performing TES Edits and Bar Edits, introducing innovative plans to eliminate missing charges, overseeing managers and staff that manage Coding, Billing, Denials, Edits and Analysis, relocating over $10 million in missing charges and consequently, creating a reconciliation process for eighteen divisions within the Department of Pediatrics, directing new initiatives to monitor doctors' productivity, building a financial model that predicted an increase in revenue by 14% for financial year 2017, and managing $8-$10 million in outstanding funds to Global Services/International Patients.

21. During Plaintiff's employment with the Defendants, Plaintiff was an exemplary employee who received excellent performance reviews annually from Columbia's Chief Financial Officer regarding the work Plaintiff did.

22. Plaintiff always received extremely positive assessments of his work performance and was never written up or otherwise disciplined in connection with his performance.

23. In or around February 2018, Columbia University appointed Defendant Orange as its new Chairman of the Department of Pediatrics, effective as of June 2018.

24. In preparation of his new appointment and duties thereto as Chairman of the Department of Pediatrics, from in or around February 2018 to in or around June 2018, Defendant Orange began traveling approximately once a month, between Texas and New York, to visit

Columbia University, to meet the individuals he would be working with, and to learn about the Department in preparation for the performance of his new duties as Chairman.

25. Prior to Defendant Orange's appointment as Columbia University's Chairman of the Department of Pediatrics, for years, Defendant Orange had worked with Defendant Evans in Texas, where the two individuals grew a relationship working together at Baylor University Medical Center, a medical center located in Houston, Texas.

26. In or around April 2018, Defendant Orange hired Defendant Evans, his partner and long-time associate from Texas, to serve as Defendants' Associate Vice Chair of the Department of Pediatrics.

27. In Defendant Evans' capacity as Associate Vice Chair of the Department of Pediatrics, Defendant Evans reported to, and worked under Defendant Orange; and Plaintiff reported to Defendant Evans directly, as well as to Defendant Orange, indirectly, through Defendant Evans. Defendant Orange and Defendant Evans functionally served as direct supervisors of the Plaintiff.

28. From in or around April 2018 onward, Plaintiff began to experience a hostile work environment, repeated workplace harassment and discrimination due to the overt discriminatory and derogatory remarks, comments, discussions, actions and conduct of his supervisors, Defendant Evans and Defendant Orange.

29. Plaintiff's supervisors, Defendant Evans and Defendant Orange, harbored a discriminatory animus towards individuals of minority national origin like Plaintiff, and made numerous prejudicial, bigoted, and discriminatory remarks, directed at Plaintiff and in Plaintiff's presence.

30. Over the course of the next several months, Defendant Orange and Defendant Evans began to systematically discriminate against Plaintiff on the basis of Plaintiff's national origin by specifically targeting the Plaintiff – as well as various other employees of foreign nation origin within his department – and subjecting Plaintiff to various forms of daily, systematically discrimination, which escalated through the remainder of Plaintiff's tenure at Columbia and

ultimately culminated in the ultimate wrongful termination of Plaintiff's employment at Columbia, because of Plaintiff's national origin.

31. In addition to Plaintiff, Defendant Evans singled out other non-white employees for similar discriminatory treatment. Defendant Evans sought to constructively terminate, or "push out" these minorities, whom he pursued to replace, often times with non-minorities and usually white males.

32. By way of example, approximately two (2) weeks into Defendant Evans' employment at Columbia, Defendant Evans removed a black male employee, named Bernard Dumas, who had been serving as Columbia University's Director of Human Resources (hereinafter "HR").

33. Subsequently, Defendant Evans also removed an Indian male employee, named Jai Kasturi, who had served as Columbia University's Director of Information Technology.

34. Defendant Evans also successfully pushed out an employee named Dimitra Koutsantoni, of Greek origin, from her role as Director Research at Columbia University. Upon her resignation, Defendant Evans assumed her job responsibilities as well.

### Specific Allegations of National Origin Discrimination Against Plaintiff Kadry

35. In October 2018, Defendant Evans stated to Plaintiff that Evans was "upset" that Defendant Evans and Plaintiff were being paid similar salaries – approximately $168,000 – despite Defendant Evans' superior position and title as the Chairman of Columbia University.

36. Specifically, Defendant Evans directly told the Plaintiff: "I can't believe that your salary and my salary are the same; you are doing well for a Middle Eastern."

37. Defendant Evans asked Plaintiff: "How many other middle easterners went to Columbia Public Health School given the fact that it has such a big name for itself, and you are a foreigner? How did you get accepted into such a program?"

38. Worse yet, on numerous occasions, Defendant Evans ordered Plaintiff to pronounce, and then repeat, certain words in order to ridicule Plaintiff's heavy accent (such as "Volume" which Plaintiff pronounced as "valunm"). When the Plaintiff would follow Evans' orders and

repeated those certain words at his direction, Defendant Evans would burst out laughing at Plaintiff in the presence of others including Defendant Orange. Orange and Evans would frequently laugh at Plaintiff and publicly humiliate him around the office in this manner.

39. Additionally, as part of Plaintiff's job duties, Plaintiff would attend monthly progress meetings which were joined by Plaintiff, the Chairman of the Department of Pediatrics, the Vice Chair of Finance, and the Director of Operations. However, after Defendant Evans and Defendant Orange joined Columbia, the Defendants restructured those progress meetings in order to eliminate Plaintiff and prevent Plaintiff from being able to attend.

40. Defendant Orange and Defendant Evans continued to hold monthly progress meetings thereafter in Plaintiff's absence, and refused to include Plaintiff in, or inform Plaintiff of, those discussions.

41. In or around late 2018, Defendant Orange and Defendant Evans also began refusing to invite Plaintiff to other such "meetings" which Plaintiff should have – and previously had been – in attendance at. These meetings related to Plaintiff's job duties, assignments, and work, and related to the revenue of Columbia University, fields that Plaintiff was specifically hired for.

42. Defendants Evans and Scott also began to assign and outsource Plaintiff's work to other individuals who were much less qualified than Plaintiff to perform such work, and who often were white employees.

43. For example, the "daily services reports," which included all charges and payments that Columbia received daily, by division, which formerly were operated by Plaintiff and Plaintiff's team, were now instead delegated to Joseph Cognard at the direction of Defendant Orange and Defendant Evans.

44. Moreover, "Rejection Reports," which formally were assigned to Plaintiff, and were Plaintiff's responsibility, were outsourced by Defendants, to Joseph Cognard to run instead.

45. Defendants took responsibilities away from Plaintiff, yet perpetually accused Plaintiff of causing the issues arising from those reports. By way of example, when such reports – including Revenue Cycle reports – indicated that revenue at Columbia was down, Defendants

Orange and Evans used Plaintiff as a scapegoat, telling Plaintiff that the revenue problems were the result of Plaintiff "not doing his job." Plaintiff stated that some of those reports included "inflated numbers," which in some instances made Plaintiff appear to be at fault when Plaintiff was not, but Defendant Orange and Defendant Evans willfully turned a blind eye to any response from Plaintiff.

46. Although not in attendance himself, when revenue meetings were finished, Plaintiff frequently requested that the data be shared with him. Defendants Evans and Orange would respond to Plaintiff that they "didn't have the data" in their possession and that other individuals, i.e., Joseph Cognard, "might be able to share it with you."

47. Plaintiff explained to Defendants Evans and Orange that the revenue data upon which they relied was off by $3.5 million, and that it was causing Plaintiff to appear as if he was not doing his job, which was untrue. However, Defendants Evans and Orange deliberately ignored all responses by Plaintiff.

48. Further, Defendant Orange and Defendant Evans frequently accused Plaintiff of "sabotaging the department." This fabricated charge was purposefully spread throughout Columbia by Plaintiff's supervisors and caused significant damage to the appearance of Plaintiff's integrity and his reputation at Columbia.

49. When other directors began asking Plaintiff questions relating to the reason that revenue figures "look bad this year in comparison to last year," the conduct of Plaintiff's supervisors – Defendant Orange and Defendant Evans – rendered Plaintiff speechless, causing further ruin to Plaintiff's reputation, character, and integrity at Columbia.

50. Defendants Evans and Orange caused Plaintiff to soon become the target of all directors; directors were relying upon wrong information disseminated by Defendant Orange and Defendant Evans and attributed to Plaintiff, and as a consequence, Defendant Orange and Defendant Evans caused Plaintiff to become known as "the enemy of the department" who was "sabotaging everyone's work."

51. Plaintiff felt humiliated, embarrassed, and distraught after these incidents; however, Plaintiff understood he would be further targeted for harassment or termination if he were to

report Defendant Orange and Defendant Evans whom both held high positions of power at Columbia.

52. On February 5, 2019, an email was circulated to the administrative directors to correctly explain the revenue figures, to inform Defendant Orange and Defendant Evans that the information upon which they were relying was wrong, and to clear Plaintiff's name from sabotage or wrongdoing. However, no action was taken in response to Plaintiff's concerns.

## Investigation Into False Accusations Against Plaintiff

53. In or around January 2018, an individual by the name of Qianwei Xaio ("Janet") was hired to serve as Columbia University's Coding Coordinator at Columbia University's Department of Pediatrics. Plaintiff had previously taught Janet at LaGuardia Community College where Plaintiff held lectures which Janet would attend.

54. In Janet's capacity as Coding Coordinator at Columbia University's Department of Pediatrics, Janet reported to her direct supervisor Sandy Rivera (hereinafter, "Rivera"). Both Janet and Plaintiff reported to, and worked under Defendant Evans, and Defendant Orange.

55. Janet soon became infamously known by her peers as a "troublemaker" and frequently fabricated false allegations against her supervisor, Rivera. For example, Janet accused Rivera of threating to remove her from her job if she did not do what Rivera asked of her.

56. Janet reported her allegations against Rivera to Columbia's Pediatrics Human Resources Department, and to Columbia's Central Human Resources Department ("HR"). Ultimately, neither HR Department found Janet's allegations against Rivera to be credible or truthful.

57. Throughout late 2018 and early 2019, Janet shifted those same allegations onto the Plaintiff, and in similar fashion, fabricated and circulated accusations concerning the Plaintiff as well, wrongfully accusing Plaintiff of having "harassed her" in one form another, which Plaintiff did not do.

58. Janet baselessly accused Plaintiff of having "partnered" with Rivera to remove her and/or other individuals, including an employee named Yasmin Guerrero. This false charge was shared with managers and was reported to HR, yet, unremarkably, was never investigated into.

59. During this time, Janet also requested to her supervisor a 26% increase to her salary. However, when Janet's request was denied, she became disgruntled and frivolously accused the Plaintiff of having been "responsible" for the "denial" of her request. This baseless accusation that the Plaintiff was responsible for changes to her salary, or lack thereof, however, was obvious as it was not a function that fell within the scope of Plaintiff's power, but rather Rivera's.

60. Consequently, when Janet could not resolve issues between herself and other individuals including Rivera, Rivera decided to put an end to Janet's ongoing issues by requesting that Janet be relocated to work at a different office within the city.

61. In response to this, Janet reacted by retaliating against Plaintiff, accusing Plaintiff of having been responsible for the decision which Plaintiff was not.

62. Janet then baselessly accused Plaintiff of engaging in sexual or romantic relationships with numerous other mangers – in addition to herself. As explained below, this false accusation against Plaintiff opened the door for an investigation into Janet's false allegations against Plaintiff, which Defendant Orange and Defendant Scott exploited as a pretext for the ultimate wrongful termination of Plaintiff's employment.

63. Prior to Janet's hiring by Defendants, Plaintiff was never written up, or otherwise complained of for having engaged in any misconduct whatsoever, throughout the course of – not only his tenure at Columbia, but also – his entire professional career.

64. In or around January 2019, Janet formally reported these allegations concerning Plaintiff to the Office of Equal Employment and Affirmative Action (hereinafter, "EOAA") including her false allegations accusing Plaintiff of having subjected her to sexual harassment and/or retaliation, which Plaintiff did not do.

## EEOA Investigation

65. One of Janet's false allegations, that Plaintiff had "sexually harassed" her, invoked Columbia's Rules on "Consensual Romantic and Sexual Relationship Policy Between Staff Members,"[1] and the "Columbia University Employee Policy And Procedures On Discrimination, Harassment, Sexual Assault, Domestic Violence, Dating Violence, And Stalking,"[2] which became the forefront of the investigation into Plaintiff.

66. During the course of the investigation into Janet's allegations, the EOAA frequently contravened the rules, and its procedures.

67. EOAA specifically directed Janet and Plaintiff to not share or speak about information relating to the investigation with anyone.

68. Throughout the EOAA investigation, Janet continued to circulate false rumors about Plaintiff while the EOAA breached the rules on confidentiality of information pending the investigation, by permitting Janet to spread discuss her false allegations and circulate those rumors within and around Columbia University.

69. On the contrary, Plaintiff fully complied with the EOAA investigation by attending numerous meetings with the EOAA, timely submitting all documentation requested of him, and by refraining from speaking openly about allegations subject of the investigation, as EOAA ordered the parties not to do.

70. Plaintiff showed the EOAA an email demonstrating that Rivera had ordered Janet to be relocated to the city office, yet the EOAA were repeatedly dismissive of the evidence and continued to accuse Plaintiff of having been responsible for the decision to relocate Janet to another premises, despite Plaintiff's showing of proof to the contrary.

---

[1] "Should a consensual romantic or sexual relationship between staff members lead to a charge of sexual harassment or sexual assault, the University is obligated to investigate and resolve the charge in accordance with the University's Employment Policies and Procedures on Discrimination and Harassment." A full copy of the policy text can be found online at:
https://eoaa.columbia.edu/sites/default/files/content/docs/consensual_relationship_policies_staff_to_staff.nov_2019.pdf
[2] https://eoaa.columbia.edu/sites/default/files/content/docs/EOAA_Policy_01_29_2020_reupload.pdf and
https://eoaa.columbia.edu/sites/default/files/content/docs/EOAA-Policies-and-Procedures-081420-Final.pdf

71. When Plaintiff showed the EOAA emails demonstrating that Rivera had ordered Janet to be relocated to the city office, the EOAA repeatedly dismissed all the evidence Plaintiff proffered and continued to accuse Plaintiff of, among other things, having been responsible for the decision to relocate Janet despite Plaintiff's showings of proof to the contrary.

72. When Janet realized her false allegations were "losing steam," Janet retaliated against Plaintiff by falsely accusing Plaintiff of having "offered her $500.00" to "sleep with her," which she falsely contended she had "turned down." Janet also falsely accused Plaintiff of having an "Asian fetish" – an allegation which she and other individuals at Columbia spread throughout Columbia in order to further damage Plaintiff's reputation.

73. On June 18, 2019, the EOAA informed Plaintiff that (i) the EOAA had determined Plaintiff engaged in sexual harassment under the policy and (ii) Plaintiff's retaliation claim was not supported by sufficient evidence to conduct a policy analysis.

74. The EOAA also informed Plaintiff that "the policy provides you with specific appeal rights." Specifically, the EOAA informed Plaintiff that he had the right to appeal the EOAA's determinations by submitting a written statement of his appeal within ten business days, to Heather Parlier ("Parlier"), the Associate Provost of the EOAA, by July 2, 2019.

75. On June 19, 2019, Plaintiff was summoned to EOAA to review the EOAA "findings." There, the EOAA presented Plaintiff with documents which formed the basis of the accusatory charges against Plaintiff.

76. As Plaintiff reviewed the documents at the meeting, Plaintiff attempted, again, to explain that the documents were replete with fallacies being purported as true against him, and that his presentation of the facts – including the contents of email exchanges from December 2018 and January 2019 – were not incorporated into, and had not been considered, as part of the investigatory processes.

77. EOAA investigators were utterly dismissive in any evidence Plaintiff presented and were disinterested in procedural errors and omissions took place throughout the investigation – an argument Plaintiff asserted that continued to fall onto deaf ears.

## Plaintiff's Termination And Appeal Process

78. On June 20, 2019, Plaintiff received a letter informing Plaintiff of the termination of his employment with Columbia University. The June 20, 2019 letter stated that Plaintiff was "being released from [his] position effectively immediately without consideration for rehire."

79. Plaintiff was terminated from Columbia University on June 20, 2019, effectively immediately, and without consideration for rehire, despite the EOAA informing Plaintiff just two (2) days earlier, on June 18, 2019, of his "right to appeal the EOAA's determinations of its investigation by July 2, 2019."

80. Plaintiff was terminated on June 20, 2019 because of the EOAA's investigation.

81. In early July 2019, Plaintiff wrote to the EOAA to formally appeal the findings which resulted in Plaintiff's termination.

82. On July 15, 2019, Parlier wrote to Plaintiff to confirm the EOAA's receipt of Plaintiff's appeal. However, Parlier also wrote that, "EOAA is not the proper avenue for refuting your termination."

83. On July 18, 2019, Plaintiff wrote back to Parlier, explaining Plaintiff's compliance with the EEOA appeals procedure per the Policy. Specifically, Plaintiff asserted that his appeal was grounded upon the incomprehensiveness and lack of fairness during the investigation, and that the investigation was conducted with various procedural errors, predicated upon factual falsities resulting in wrongful conclusions that were unsupported by any substantial evidence.

84. Plaintiff also stated that he was "treated unfairly throughout the investigation process," and that reports in the investigative files contained false information resulting in inaccurate conclusions.

85. Plaintiff reiterated that interviews which should have taken place in fact did not, and that the EOAA investigation into Janet's false allegations of sexual harassment were not properly investigated into nor detailed within the investigation as they simply had not occurred.

86. Rather than protecting all parties to the investigation or remaining objective and neutral throughout the process, the EOAA blindly adopted Janet's false allegations against Plaintiff as being true, without conducting a proper, adequate investigation into the matter.

87. Throughout the investigation against Plaintiff, the EOAA permitted Janet to continue to circulate rumors and other untruthful information about Plaintiff around Columbia, and permitted Janet to share detailed, confidential information about the investigation and allegations against Plaintiff to make Plaintiff "look bad," despite Plaintiff's frequent objections, and in violation of the Policy.

88. Moreover, following Plaintiff's termination, the EOAA permitted Janet to circulate rumors and untruthful information about the Plaintiff around Columbia, and permitted Janet to share detailed, confidential information about the investigation and the allegations against Plaintiff in violation of the Policy.

89. The above-referenced confidentiality violations of EOAA Policy permitted and caused Plaintiff to be treated unfairly by the EOAA throughout its investigative process.

90. Specifically, Janet shared confidential information about the investigation with, among other individuals, an employee named Miriam Diaz.

91. In contrast, Plaintiff fully complied all his obligations throughout the EOAA investigation and provided the EOAA with emails and evidence utterly refuting the allegations against Plaintiff, which should have exonerated Plaintiff from the charges asserted against him.

92. However, the EOAA was utterly and inappropriately dismissive of Plaintiff's statements, and denied Plaintiff his right to a timely, formal appeal.

## Plaintiff's Report of Retaliation with the EOAA

93. On or about October 1, 2019, Plaintiff filed a report with the EOAA on grounds that Plaintiff was subjected to "wrongful termination and conduct amounting to retaliation, in violation of the Policy" ("Plaintiff's Report").

94. Plaintiff frequently followed up on Plaintiff's Report with Parlier, the Vice Provost, who perpetually failed to timely respond to Plaintiff's emails and communications relating to Plaintiff's Report.

95. On October 3, 2019, Molly Wayne ("Wayne"), the Associate Director of Investigations for EOAA, emailed Plaintiff on behalf of EOAA stating that "Columbia takes [Plaintiff's] allegations very seriously. I would like to meet with you to learn more…"

96. Subsequently, however, Wayne informed the Plaintiff that there was no need to investigate Plaintiff's Report, as Janet had been sent to training such that a "resolution" had been reached.

97. On October 11, 2019, Wayne emailed Plaintiff stating that, "I will follow up with you directly regarding next steps in response to your retaliation complaint."

98. However, the EOAA failed to take any action to investigate Plaintiff's report, and again, were dismissive of any grievance Plaintiff asserted relating to the investigation or his wrongful termination.

99. Defendant Evans and Defendant Orange acted with impunity towards Plaintiff and exploited the investigation into Janet's allegations against Plaintiff as an opportunity – and as a pretext – to alter the terms and conditions of Plaintiff's employment with Columbia which they had sought to do from the onset of their employment with Columbia.

100. Plaintiff's contentions, grievances, and appeal process were rejected at every level at Columbia at the direction of Defendant Orange and Defendant Evans. Involved employees within Defendant Columbia understood or, upon information and belief, were told that this was "the way" for Defendant Orange and Defendant Evans to "get Plaintiff out."

101. Throughout the investigation into Plaintiff, Plaintiff presented various evidence with supervisors, EOAA, and with HR that exonerated Plaintiff from allegations asserted against him which was neither considered nor taken into account throughout the investigation process.

102. Time after time, Plaintiff asserted his right to a fair process, stated that he was being treated unfairly and being held to a different standard throughout the course of the investigation, and asserted that he was becoming victim to abuses of power.

### Disparate Treatment Against Plaintiff

103. Throughout the investigation processes, the EOAA treated Plaintiff far worse than they treated his wrongful accuser.

104. Throughout the investigation processes, Defendants treated Plaintiff worse than his wrongful accuser.

105. Plaintiff was entitled to a fair, thorough, unbiased, transparent, and nondiscriminatory investigation process before adverse employment action was taken against him. However, Plaintiff was denied such due process throughout the course of the investigation.

106. There had been many instances of employees at Columbia University having a romantic relationship with one another, yet none were investigated nor terminated like Plaintiff.

107. Following Plaintiff's termination, on or about October 7, 2019 Defendants hired Michael Nittolo ("Nittolo"), a white male, to replace Plaintiff as Columbia's new Director of Revenue Cycle instead of Plaintiff.

108. On or about October 21, 2019, Nittolo asked a co-worker, Reggie Johnson, if Plaintiff was "sleeping with Janet, or with Rivera."

109. When Reggie Johnson asked Nittolo who told him that, Nittolo responded that "everyone in the city is talking about that and saying that."

110. When Plaintiff was informed of this, Plaintiff reported this information to EOAA which became part and parcel to Plaintiff's Report.

111. Plaintiff related to EOAA that this interaction evidenced, among other things, that Janet was continuing to spread false accusations against and fabricate stories about Plaintiff, resulting in further detriment to Plaintiff's integrity and reputation. EOAA failed to respond or take remedial action.

## Damage to Plaintiff's Reputation

112.   That as a result of the foregoing, the Defendants have caused significant damage and ruin to Plaintiff's professional career, reputation, and ability to earn an income following his wrongful termination at Defendant Columbia.

113.   Defendant Columbia is one (1) of five (5) major medical centers in the New York City region and the foregoing has since prevented Plaintiff from finding comparable employment following his wrongful termination by Defendants.

114.   From in or around June 2019 until in or around August 2019, Plaintiff applied to various medical centers in the New York City area for a new position of employment, including, but not limited to, NYU Medical, Montefiore Medical Center, Cornell Medical Center, Sloan Kettering, and Northwell Health, among others, to no avail.

115.   Specifically, Plaintiff applied, and interviewed, for a position at the Department of Orthopedics at the Icahn School of Medicine at Mount Sinai Medical Center ("Mount Sinai").

116.   During Plaintiff's interview process with Mount Sinai, Plaintiff was asked if Plaintiff knew Ms. Miriam Diaz, the Division Administrator in the Department of Pediatrics at Columbia University, who at this point in time had become Janet's new supervisor instead of Ms. Rivera. When Plaintiff responded "yes," the interview took a sharp turn for the worse. Plaintiff then did not hear back from Mount Sinai for several weeks until after Plaintiff was unexpectedly informed that Mount Sinai had selected another candidate for the open position.

117.   Despite Plaintiff being highly qualitied for the positions for which Plaintiff sought new employment, due to his tarnished reputation, Plaintiff ultimately did not, and could not, find comparable employment following the termination of his employment with Columbia.

118.   Following Plaintiff's wrongful termination, Defendants continued to circulate false allegations around Columbia about Plaintiff, including a new false accusation alleging that Plaintiff allegedly "stole $1,000,000" from Defendants and "has now been terminated since he broke the ethic codes."

119.     Plaintiff requested that the EOAA investigate this false accusation, and yet again, Columbia refused to investigate into matters Plaintiff brought to the Defendants' and EOAA's attention.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Discrimination under Title VII)

120.     Plaintiff repeats and re-alleges each and every allegation contained herein.

121.     Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discharge any individual because of, among other things, such individual's race, religion and national origin. Title VII also prohibits employer actions that have the purpose or effect of discriminating against persons because of their real or perceived national origin.

122.     Plaintiff is Egyptian – and a part of a protected class, of national origin belonging to a minority class of individuals.

123.     Defendant Orange and Defendant Evans – in addition to the supervisors, investigators and relevant individuals referenced herein – are white.

124.     At all times relevant hereto, Plaintiff is, was, and has been qualified for his position as the Director of Revenue Cycle at Columbia University Medical Center's Department of Pediatrics.

125.     Defendants have discriminated against Plaintiff on the basis of his national origin – and/or race and religion – in blatant violation of the anti-discriminatory provisions of Title VII, by, among other things, subjecting Plaintiff to continued, perpetual and systematic harassment at Columbia on the basis of Plaintiff's national origin and terminating the employment of Plaintiff.

126.     Plaintiff, as a member of a national origin group, was discriminated against by Defendants because of his physical, linguistic, and/or cultural characteristics closely associated with his national origin group.

127.     Plaintiff was subjected to a hostile work environment by the actions of his supervisors, Defendant Orange and Defendant Evans, including ethnic slurs, ridicule, intimidation, and other offensive conduct directed towards the Plaintiff because of his birthplace,

ethnicity, culture, language, dress, and foreign accent, which manifested in adverse action taken against him.

128. Plaintiff has established that Defendants engaged in a pattern and practice of discrimination, in the manner in which Plaintiff was treated.

129. Defendant Columbia knew, or should have known, of the discriminatory conduct of Defendant Orange and Defendant Evans perpetrated against Plaintiff, and refused to take any remedial action(s).

130. A motivating factor for the treatment and wrongful termination was Plaintiff's minority national origin.

131. Defendants discriminated against Plaintiff with respect to his employment terms, working conditions and privileges of employment in violation of Title VII of the Civil Rights Act of 1964.

132. Defendants caused Plaintiff to suffer adverse employment actions, including, but not limited to, changes in work assignments, segregation and classification, arbitrary discipline, and other changes to the terms and conditions of Plaintiff's employment, including termination and loss of wages and benefits.

133. The Defendants' investigations into Plaintiff were conducted in a discriminatory manner, and Defendants' policies were applied as to the Plaintiff in a discriminatory manner, resulting in Plaintiff's wrongful termination.

134. But for Plaintiff's national origin, Defendants would not have engaged in, or subjected Plaintiff to, the above-referenced discrimination and adverse employment actions.

135. Plaintiff's national origin played a demonstrable role in the Defendants' discriminatory conduct perpetrated against Plaintiff, Defendants' inadequate investigation into false allegations against Plaintiff, and the Defendants' termination of Plaintiff's employment with Columbia.

136.     Several other employees of Defendant Columbia who are not foreigners belonging to a protected class of individuals and of minority origin, were treated better and more favorably than Plaintiff, and were not harassed, ridiculed, disciplined, discharged, discriminated against, nor investigated to in the manner that Plaintiff was or terminated like Plaintiff was.

137.     By acting on the basis of prejudices rather than Plaintiff's actual conduct, performance and record, Defendants unlawfully discriminated against Plaintiff based on national origin.

138.     Defendants have acted knowingly and willfully in violation of Title VII.

139.     Defendants violated Title VII by discriminating against Plaintiff on the basis of his national origin inasmuch as Defendants engaged in a course of conduct, as stated above which collectively resulted in Plaintiff's termination.

140.     As a proximate cause of Defendants' discrimination of Plaintiff, Plaintiff has suffered and continues to suffer substantial loss of compensation, as well as severe emotional and other damages as a result of this conduct, all damages to Plaintiff's detriment in an amount to be determined at the time of trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Discrimination under NYCHRL § 8-107(1)(a))

141.     Plaintiff repeats and re-alleges each and every allegation contained herein.

142.     Defendants employ four or more employees and thus is an "employer" under New York City Adm. Code.

143.     The New York City Human Rights Law makes it an unlawful discriminatory practice for an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, or immigration or citizenship status of any person: to discharge from employment such person; or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

144.     In violation of the NYCHRL, the Defendants repeatedly discriminated against Plaintiff on the basis of his national origin, by among other things perpetually subjecting Plaintiff

to continued harassment on the basis of his national origin, creating a hostile working environment for Plaintiff, retaliating, and terminating Plaintiff's employment.

145. The prohibited discriminatory factor – Plaintiff's national origin – played a motivating part in the discriminatory conduct against Plaintiff, including the decision to wrongfully terminate the Plaintiff.

146. Defendants' actions and conduct described herein subjected Plaintiff to adverse employment action under circumstances giving rise to an inference of discrimination.

147. Defendant JORAN SCOTT ORANGE is personally liable for the discrimination and wrongful termination of Plaintiff in that Defendant Orange qualifies as an "employer" for the purposes of individual liability under the New York City Adm. Code by virtue of his ability to affect the terms and conditions of Plaintiffs' employment.

148. Defendant JON EVANS is personally liable for the discrimination and wrongful termination of Plaintiff in that Defendant Evans qualifies as an "employer" for the purposes of individual liability under the New York City Adm. Code by virtue of his ability to affect the terms and conditions of Plaintiffs' employment.

149. Defendant Orange's and Defendant Evans' bigoted, discriminatory, and prejudiced comments, slurs, jokes, and adverse actions against Plaintiff created, and gave rise to a hostile work environment for the Plaintiff.

150. Defendants violated the New York City Human Rights Law, New York City Adm. Code §8-107 *et seq.* by discriminating against Plaintiff on the basis of his national origin inasmuch as the Defendants engaged in a course of conduct, as stated above which collectively resulted in Plaintiff's discrimination, harassment, and termination.

151. But for Defendants engaging in such a course of conduct, Plaintiff would not have been caused to suffer discrimination, harassment, and termination.

152. Defendants' conduct was done in conscious disregard of Plaintiff's rights in violation of New York City Human Rights Law, New York City Adm. Code §8-107 *et seq.*

153.     Therefore, Plaintiff is entitled to back pay and front pay, lost past and future earnings, non-pecuniary damages for pain and suffering relating to the emotional harm Plaintiff suffered and injunctive relief.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Discrimination under NYSHRL)

154.     Plaintiff repeats and re-alleges each and every allegation contained herein.

155.     The New York State Human Rights Law prohibits discrimination based upon an individual's national origin by employers.

156.     In violation of the NYSHRL, Defendant repeatedly discriminated against the Plaintiff on the basis of national origin by, among other things, subjecting him to continued harassment and retaliation against Plaintiff.

157.     Defendant, upon information and belief, employs four or more persons and are thus an "employer" covered by the Human Rights Law.

158.     Defendant JORAN SCOTT ORANGE is personally liable for the discrimination and specifically, the termination of Plaintiff in that he qualifies as an "employer" for the purposes of individual liability under the New York City Adm. Code by virtue of his ability to affect the terms and conditions of Plaintiffs' employment.

159.     Defendant JON EVANS is personally liable for the discrimination and specifically, the termination of Plaintiff in that he qualifies as an "employer" for the purposes of individual liability under the New York City Adm. Code by virtue of his ability to affect the terms and conditions of Plaintiffs' employment.

160.     Defendants violated the New York State Human Rights Law, New York Executive Law §290 *et seq.* (and in particular Executive Law §§ 296-297) by discriminating against Plaintiff on basis of his national origin inasmuch as Defendant engaged in a course of conduct, as stated above which collectively resulted in Plaintiff's discrimination, harassment and termination.

161.    Defendants' conduct was done in conscious disregard of Plaintiff's rights in violation of New York State Human Rights Law, New York Executive Law §290 *et seq.*

162.    Therefore, Plaintiff is entitled to back pay and front pay, lost past and future earnings, non-pecuniary damages for pain and suffering relating to the emotional harm Plaintiff suffered and injunctive relief.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Title VII - Unlawful Retaliation)

163.    Plaintiff repeats and re-alleges each and every allegation contained herein.

164.    Title VII's antiretaliation provision forbids employer actions that "discriminate against" an employee because he has "opposed" a practice that Title VII forbids or has "made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a).

165.    In complaining about Plaintiff's discrimination on the basis of his race, religion and national origin, Plaintiff was engaging in a protected activity, and Defendants were fully aware of that.

166.    Defendants treated Plaintiff adversely because of his complaints and engaged in a knowing, intentional, willful and voluntary course of wrongful retaliatory conduct in violation of 42 U.S.C. § 2000e-3(a).

167.    As a result of Defendants' unlawful retaliation as described above, Plaintiff is entitled to back pay and front pay, lost past and future earnings, non-pecuniary damages for pain and suffering relating to the emotional harm Plaintiff suffered and injunctive relief.

168.    Defendants should be assessed punitive damages in an amount to be determined at trial to adequately punish Defendants and to deter Defendants from engaging in such illegal and immoral conduct in the future.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (NYCHRL - Unlawful Retaliation)

169.    Plaintiff repeats and re-alleges each and every allegation contained herein.

170.     Defendants' conduct as described is violative of the anti-retaliation provision of the NYCHRL, Section 8-107(7) of the Administrative Code of the City of New York.

171.     In complaining about Plaintiff's discrimination on the basis of his race, religion and national origin, Plaintiff was engaging in a protected activity, and Defendants were fully aware of that.

172.     Defendants treated Plaintiff adversely because of his complaints and engaged in a knowing, intentional, willful and voluntary course of wrongful retaliatory conduct in violation of the NYCHRL.

173.     As a result of Defendants' unlawful retaliation as described above, Plaintiff is entitled to back pay and front pay, lost past and future earnings, non-pecuniary damages for pain and suffering relating to the emotional harm Plaintiff suffered and injunctive relief.

174.     Defendants should be assessed punitive damages in an amount to be determined at trial to adequately punish Defendants and to deter Defendants from engaging in such illegal and immoral conduct in the future.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (NYSHRL - Unlawful Retaliation)

175.     Plaintiff repeats and re-alleges each and every allegation contained herein.

176.     Defendants' conduct as described is violative of the anti-retaliation provision of the NYSHRL, Executive Law § 296.7.

177.     In complaining about Plaintiff's discrimination on the basis of his race, religion and national origin, Plaintiff was engaging in a protected activity, and Defendants were fully aware of that.

178.     Defendants treated Plaintiff adversely because of his complaints and engaged in a knowing, intentional, willful, and voluntary course of wrongful retaliatory conduct in violation of the NYSHRL.

179. As a result of Defendants' unlawful retaliation as described above, Plaintiff is entitled to back pay and front pay, lost past and future earnings, non-pecuniary damages for pain and suffering relating to the emotional harm Plaintiff suffered and injunctive relief.

180. Defendants should be assessed punitive damages in an amount to be determined at trial to adequately punish Defendants and to deter Defendants from engaging in such illegal and immoral conduct in the future.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Defamation of Character)

181. Plaintiff repeats, re-alleges and incorporates by reference each and every allegation contained herein.

182. As detailed herein, Defendant Columbia, through its agents, negligently, recklessly and/or deliberately adopted, spread, and circulated false accusations and rumors about the Plaintiff.

183. Defendant Orange, personally and through his agents, negligently, recklessly and/or deliberately adopted, spread, and circulated false accusations and rumors about the Plaintiff.

184. Defendant Evans, personally and through his agents, negligently, recklessly and/or deliberately adopted, spread, and circulated false accusations and rumors about the Plaintiff.

185. The Defendants and their agents falsely accused Plaintiff of engaging in conduct detrimental to Columbia's revenue. These false statements were made to directors, and subsequently spread throughout Columbia.

186. The Defendants and/or their agents falsely accused Plaintiff of having stolen money from Columbia, a serious crime.

187. The Defendants and their agents made false statements that caused injury to Plaintiff in his trade, business, or profession.

188.    The Defendants and/or their agents falsely accused Plaintiff of having engaged in sexual misconduct.

189.    The Defendants and/or their agents falsely charged Plaintiff with having sexually harassed Janet.

190.    The Defendants and/or their agents falsely accused Plaintiff of being in a relationship with Janet.

191.    The Defendants and/or their agents falsely accused Plaintiff of having offered Janet $500 to "sleep with her."

192.    The Defendants and/or their agents falsely accused Plaintiff of changing, altering, or interfering with conditions of Janet's employment, including her salary and placement.

193.    When confronted with these allegations, Defendants and their agents negligently failed to investigate their veracity, ignoring available evidence to the contrary. Instead, Defendants and its agents adopted these false statements against the Plaintiff, incorporating them into the EOAA summary report which formed the basis of Plaintiff's termination.

194.    As a direct result, Defendants and their agents exposed Plaintiff to public contempt, ridicule, aversion, and disgrace, both within and outside Columbia.

195.    As a direct result, Defendants and their agents caused others from associating or dealing with Plaintiff.

196.    In particular, as a result, Plaintiff was unable to find comparable employment at another major medical center in the New York City area following his termination.

197.    As a result, Plaintiff has suffered damages in an amount to be proven at trial, including but not limited to, harm to his reputation, emotional harm, exposure to contempt, ridicule, shame, and loss of income, causing Plaintiff both emotional and economic damages.

198.    In making of defamatory statements identified herein, Defendants and their agents acted with malice, and are thus responsible for punitive damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that judgment be granted:

a. On Plaintiff's First Cause of Action for violation of Title VII, *inter alia*, back pay, front pay, the value of lost benefits to be determined at trial, together with compensatory damages and punitive damages in amounts to be determined at trial, but which are believed to exceed applicable Title VII caps on such damages;

b. On Plaintiff's Second Cause of Action for violation of the NYCHRL, *inter alia*, back pay, front pay, the value of lost benefits and compensatory damages in amounts to be determined at trial;

c. On Plaintiff's Third Cause of Action for violation of the NYSHRL, *inter alia*, back pay, front pay, the value of lost benefits to be determined at trial, together with punitive damages in an amount to be determined at trial;

d. On Plaintiff's Fourth Cause of Action for unlawful retaliation in violation of Title VII, *inter alia*, back pay, front pay, the value of lost benefits to be determined at trial, together with compensatory damages and punitive damages in amounts to be determined at trial, but which are believed to exceed applicable Title VII caps on such damages;

e. On Plaintiff's Fifth Cause of Action for retaliation in violation of the NYCHRL, *inter alia*, back pay, front pay, the value of lost benefits and compensatory damages in amounts to be determined at trial;

f. On Plaintiff's Sixth Cause of Action for unlawful retaliation in violation of the NYSHRL, *inter alia*, back pay, front pay, the value of lost benefits to be determined at trial, together with punitive damages in an amount to be determined at trial;

g. On Plaintiff's Seventh Cause of Action for defamation, compensatory and punitive damages in an amount to be proven at trial;

h. Awarding Plaintiff prejudgment and post-judgment interest;

i. Awarding Plaintiff costs of this action and reasonable attorneys' fees;

j. Awarding such and further relief as this court deems necessary and proper;

k. Judgment declaring Defendants violated the aforementioned statutes;

l. Defendants, their agents, employees, officers, and successors in interest, and those acting in concert with Defendants, be permanently enjoined from discriminating on any basis forbidden by Title VII;

m. Defendants, their agents, employees, officers, and successors in interest, and those acting in concert with Defendants, be permanently enjoined from discriminating on any basis forbidden by NYCHRL;

n. Defendants, their agents, employees, officers, and successors in interest, and those acting in concert with Defendants, be permanently enjoined from discriminating on any basis forbidden by NYSHRL; and

o. For any such other and further relief that is just, proper, or equitable.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by the complaint.

Dated: Kew Gardens, NY
January 28, 2021

By: _____
Roman Avshalumov (RA 5508)
Helen F. Dalton & Associates, P.C.
*Attorneys for Plaintiff*
80-02 Kew Gardens Road, Suite 601
Kew Gardens, New York 11415
Telephone: 718-263-9591
Fax: 718-263-9598

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KHALED KADRY,

Plaintiff,

-against-

COLUMBIA UNIVERSITY MEDICAL CENTER,
and JORDAN SCOTT ORANGE, and JON EVANS,
as individuals,

Defendants.

**COMPLAINT**

**HELEN F. DALTON & ASSOCIATES, P.C.**
*Attorneys for Plaintiff*
80-02 Kew Gardens Road, Suite 601
Kew Gardens, New York 11415
Telephone: 718-263-9591
Fax: 718-263-9598

TO:

**COLUMBIA UNIVERSITY MEDICAL CENTER**

622 WEST 168TH STREET
NEW YORK, NEW YORK 10032

630 WEST 168TH STREET
NEW YORK, NEW YORK 10032

**JORDAN SCOTT ORANGE**
622 WEST 168TH STREET
NEW YORK, NEW YORK 10032

**JON EVANS**
630 WEST 168TH STREET
NEW YORK, NEW YORK 10032